## MacCRONE et al. v. AMERICAN CAPITAL CORPORATION et al.

### Civil Action No. 320.

District Court, D. Delaware.

Aug. 25, 1943.

Hugh M. Morris and Alexander L. Nichols (of Morris, Steel, Nichols & Arsht) both of Wilmington, Del., and Howell Van Auken, of Detroit, Mich., for plaintiffs.

C. S. Layton (of Richards, Layton & Finger), of Wilmington, Del., and Alfred Jaretzki, Jr. (of Sullivan & Cromwell), of New York City, for defendants.

LEAHY, District Judge.

Plaintiffs own 65,024 shares of Class B common stock of American Capital Corporation (hereinafter called "American"). They also own 1 share of preferred, 2,181 shares of Class A common, and 1,349 shares of Class B common of Pacific Southern Investors, Inc. (hereinafter called "Pacific").

American and Pacific stockholders were to meet on June 29, 1943, to vote on a proposed merger of both companies. On the morning of that day, plaintiffs filed their complaint seeking an injunction against the holding of the meeting for the reasons which I shall detail shortly. I refused to restrain the holding of the meeting on the ground that if the stockholders refused to approve the merger, the matter before me would be moot; if, on the other hand, the requisite majority of the stockholders voted to approve the plan, I would issue an order restraining defendants and their officers from taking any further action to effectuate the plan of merger, until it was determined whether there was any equity in plaintiffs' complaint. The restraining order issued.

The vote was had. Results:

### American Capital Corporation

| | Shares Entitled to Vote | Shares Present in Person or by Proxy | For Merger | Against Merger |
|---|---|---|---|---|
| Prior Preferred | 24,298 | 18,234 | 17,348 | 886 |
| Preferred | 88,000 | 71,028 | 67,635 | 3,393 |
| Class A Common | 110,472 | 98,280 | 93,883 | 4,397 |
| Class B Common | 632,662 | 514,114 | 424,021 | 90,093 |
| Totals | 855,432 | 701,656 | 602,887 | 98,769 |

The parties stipulated, under Rule 65 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, that the restraining order should remain in effect until after the hearing on plaintiffs' right to a preliminary injunction. It was likewise stipulated that the hearing on the preliminary injunction would be considered the same as final hearing, as all the pertinent facts concerning the merger would be presented at that time. Hearing was had on affidavits and documentary proofs.

Plaintiffs attack on two fronts: First, the plan of merger is said to be unfair. Secondly, the notice of the meeting, as far as American's stockholders are concerned, was illegal, or, if legal, it was so short that it prevented the stockholders from communicating with one another and the Court should find it inequitable to sanction such notice. These matters will be treated in inverse order.

The stockholders' meeting of American to vote on the merger was called for June 29, 1943. The Board of Directors fixed the record date for such meeting as the close of business on June 9, 1943, pursuant to Sec. 8 of the By-Laws, which provided: "The Board of Directors may, from time to time, fix the time, not exceeding twenty days, preceding the date of any meeting of the stockholders, any dividend payment date or any date for the allotment of rights during which the books of the corporation shall be closed against transfers of stock; or in lieu of providing for the closing of the books for the transfer of stock as aforesaid, the Board of Directors may, from time to time, fix a date, not exceeding twenty days preceding the date of any meeting of stockholders, any dividend payment date or any date for the allotment of rights as the record date for the determination of the stockholders entitled to notice of and to vote at such meeting, or entitled to receive such dividends or rights as the case may be; and in such case only stockholders of record on such date shall be entitled to notice of and to vote at such meeting or to receive such dividends or rights as the case may be."

Notices of the meeting and proxy material were mailed on June 6, 1943, to all stockholders of record at the close of business on June 5, 1943. No transfers of stock occurred on June 6. On June 7, 1943, 15 shares of American's Prior Preferred, 50 shares of preferred, no shares of Class A common, but 4,450 shares of Class B[1] common were transferred. On the same day the transferees were sent notices of the meeting and proxy material. On June 8, 1943, there were no transfers. On June 9, 1943, 25 shares of Prior Preferred, 1,451 shares of preferred, 338 shares of Class A common and 5,675 shares of Class B[2] common were transferred. Notices and proxy material were sent to these transferees also on the same day. The printed notice of the special meeting of stockholders of American Capital Corporation called for June 29, 1943, stated, inter alia, as follows: "The close of business on June 9, 1943, has been fixed as the record date for determining stockholders entitled to notice of and to vote at said special meeting of stockholders or at any adjournment or adjournments thereof. The transfer books of American Capital will not be closed."

Section 59 of the Delaware Corporation Law (43 Del.Laws p. 458) provides that "* * * a copy of such notice shall be mailed to the last-known postoffice address of each stockholder of each such corporation, at least twenty days prior to the date of such meeting * * *". Section 17 of the Delaware Corporation Law, Rev. Code of Del.1935, § 2049, provides that where a record date for any meeting of stockholders is fixed, in lieu of closing the stock transfer books, "such stockholders and only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to such notice of, and to vote at, such meeting and any adjournment thereof * * *".

I. *Sufficiency of the Notice.* Plaintiffs' contention is that since Section 59 of the Delaware Corporation Law uses the words, "at least twenty days", the legislature merely fixed a minimum length of time, short of which the notice would not be valid in any event, but at the same time vesting in the board of directors the duty and responsibility to fix such length of time beyond the

---

[1] Of the Class B common transferred, only 350 shares were transferred into the names of new stockholders who had not, of course, received the notice mailed on June 6, 1943.

[2] Of the preferred and Class B common transferred only 57 shares of preferred and 1,300 shares of the Class B common, were transferred into the names of new stockholders who, likewise, had not received the notice mailed on June 6, 1943.

minimum period as the circumstances and equities of the particular situation may require. In view of the complexity of the proposed plan of merger, plaintiffs argue that, viewed from the standpoint of equity, the length of the notice in the instant case was so short, there was no reasonable opportunity for the stockholders to communicate among themselves and to consider all the facts and circumstances with reference to the plan before being called upon to vote either for or against it. Moreover, plaintiffs point out that the right of full and open discussion is—or should be—the basic principle of our corporate institutions; and the denial of that right by American's present management constitutes a repudiation of the fundamental considerations of equity and fair play.

It seems to me that there is no legal basis for these views. If such had been the intention of the legislature, it could easily, and should, have expressed such intention in clear and unmistakable language. But what is more important, such a contention is at war with the dominant purpose of the Delaware Corporation Law to insure simplified corporate practice and procedure by vesting wide discretion in the board of directors. See McKee v. Rogers, 18 Del.Ch. 81, 156 A. 191; and Finch v. Warrior Cement Corporation, 16 Del.Ch. 44, 141 A. 54. If the argument of the plaintiffs is accepted, the management in each instance where a special meeting is to be called would be required to determine what particular period beyond the twenty days would be reasonable. From a practical view this would create an intolerable situation as directors could never be certain that what they have done may not be undone by some particular judge who could substitute his views on what is a reasonable notice for the views of the directors. I think the legislature intended that the twenty day period should in all cases be sufficient, but that a board of directors in the exercise of its informed judgment might fix a period of more than twenty days when the circumstances required it. I do not think the legislature meant that the court should substitute its notion of what constitutes reasonable notice beyond the twenty day period for that of the board of directors. If this construction is to be had, then plaintiffs argue that the twenty days notice provided in the statute was not given to *each stockholder*. Hence, they contend, it is the rule that strict compliance with Section 59 must be had or else the merger is invalid.

The phrase "at least" has been interpreted by the Delaware courts in connection with the computation of periods of time to mean full days. Robinson v. Collins, 1 Har. 498; Warrington v. Tull, 5 Har. 107; Matter of Public Roads, 5 Har. 174; Morris v. Morris, 4 Boyce 431, 89 A. 54; Jones v. Hinderer, 7 Boyce 516, 108 A. 737; State ex rel. Content v. Bay State G. Co. and Addicks, 4 Pennewill 214, 57 A. 291. Applying the rule of the Delaware cases, I hold that the proper construction of Section 59 is that the notice required therein shall be given by mail for a period not less than twenty full days before the date of the stockholders' meeting. This means that both the day of the mailing of the notice, viz., June 6, and the day of the meeting, viz., June 29, should be excluded. With both such days excluded, it is apparent that more than the statutory period of twenty days was given if the June 6th date controls.

In support of its attack on the insufficiency of the notice (on the ground that it was not mailed to each stockholder at least twenty days prior to the meeting) and that Section 59 has not been complied with, plaintiffs urge that the notice which was mailed on June 6 stated that the record date for determining stockholders entitled to notice and to vote should be June 9.[3] Notices were sent to such persons as became stockholders between June 6 and June 9. Those who became stockholders on June 9 did not and could not receive the statutory twenty day notice. Since I am of the opinion that Section 59 requires that notice be mailed twenty full days before the meeting, it necessarily follows that the by-law provision permitting less than twenty days notice so far as it is applicable to Section 59 is invalid and of no effect and the action taken by the directors in fixing the record date thereunder must be disregarded. Gaskill v. Gladys Bell Oil Co., 16 Del.Ch. 289, 146 A. 337; Gow v. Consolidated Coppermines Corp., 19 Del.Ch. 172, 165 A. 136. Since American's by-law provision so far as it is applicable to Section 59 is invalid, the record date can have no significance. Notices of the meeting were mailed to all

---

[3] The record date of June 9 was fixed in accordance with the above quoted provisions of the by-laws.

466

stockholders of the corporation on June 6 in compliance with the statute. The notice necessarily followed the stock; and in the absence of any other date of notice all stockholders of the company, whether they were stockholders of record on June 6, or became stockholders subsequently, were bound by such notice. Any transferee of such stock, in legal contemplation at least, received notice through his transferor. This is a practical rule of necessity, for if the rule were otherwise, it would be quite impossible to hold a special stockholders meeting where a record date is not fixed or where the stock transfer books are not closed.

In addition to the mailing on June 6, notices were mailed on June 7 to all persons becoming stockholders on that date, and on June 9 to all persons becoming stockholders on that date. But, the transfers on June 7 and June 9, and the mailings on such dates, cannot affect the mailings already made on June 6 in compliance with the statute. The subsequent mailings were obviously made in an effort to comply with the provisions of the by-law. If the by-law provisions did not permit the fixing of a record date in this instance in conformity with the statutory requirements, then the by-law provisions were inapplicable to this situation; and the mailings pursuant thereto were immaterial. The additional mailings certainly could do no harm. This is especially clear here since the transfers made on June 7 and June 9, even if material, were insufficient to affect the result of the vote at the meeting.

I conclude on the basis of the facts before me that the notice which was mailed on June 6 complies with Section 59 of the Delaware Corporation Law in all respects.

II. *Fairness of the Plan.* We apply here the Delaware decisional and statutory law. Under that law, where the required statutory majorities have the right to merge two or more corporations, there is a presumption of bona fides of purpose with a resultant burden on dissidents to demonstrate that the terms of the merger are so unfair as to amount to constructive fraud.[4] "Where fraud of this nature is charged, the unfairness must be of such character and must be so clearly demonstrated as to impel the conclusion that it emanates from acts of bad faith, or a reckless indifference to the rights of others interested, rather than from an honest error of judgment."[5]

The quantum of proof in the case at bar does not indicate that such fraud has been practiced by management and the majority stockholders. However, I prefer to leave the limits of the "gross unfairness" test, as fixed by the Delaware decisions, and look at the facts of the case before me to see if the merger is fair in the light of the practical adjustments inherent in this particular transaction.

The reasons for the merger or the business necessity behind it are not matters for my judicial determination.[6] But, in passing, it seems to me that the merger was planned with a constructive intent.

American's assets at market are worth approximately $5,846,000. Pacific's are worth $6,880,000. The assets of the resultant company will be worth approximately $12,071,000. The difference between the total assets of the new company and the combined assets of each company is the result of the elimination of Pacific's holdings in American having a market value of $548,200,[7] the allowance of $50,000 for the merger expenses, and a cash contribution of $56,623 to Pacific's stockholders. After merger the present $3,000,000 debt of Pacific will still remain.

The shares of the resultant company— Pacific-American Investors, Inc.—will be issued in exchange for the outstanding stocks of Pacific and American on the following basis:

Pacific Southern—*For each share of Preferred Stock* 2 shares of new Preferred ($25) and ½ share of new Common, plus a cash distribution of 90¢ per share.

*For each share of Class A Common stock* 3½ shares of new Common.

*For each share of Class B Common stock* 1/5th share of new Common.

4 Allied Chemical & Dye Corp. v. Steel & Tube Co., 14 Del.Ch. 1, 120 A. 486; Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 156 A. 183; MacFarlane v. North American Cement Corp., 16 Del.Ch. 172, 157 A. 396.

5 Porges v. Vadsco Sales Corp., Del.Ch., 32 A.2d 148, 151.

6 See Delaware cases cited footnote 4, supra.

7 E.q., 24,961 shares of preferred (28.-36% of total outstanding), 14,200 shares of Class A common (12.85% of total outstanding), and 75,000 shares of Class B common (11.85% of total outstanding).

American Capital—*For each share of Prior Preferred Stock* 1 share of new Convertible Prior Perferred stock ($100), carrying the same dividend rate and convertible at any time at the option of the holder into 4 shares of new Preferred stock and in addition into 4 shares of new Common stock, and a cash payment of 45.83¢ per share to adjust the new dividend dates of January 1, April 1, July 1, and October 1.

*For each share of Preferred Stock* 1¼ shares of new Preferred stock ($25) and 1½ shares of new Common.

*For each share of Class A Common Stock* 1 share of new Common.

*For each share of Class B Common Stock* 1/10th share of new Common.

The primary data on the status of both companies is found in the marginal note.[8] Pacific's Class A Common and American's Preferred presently have an asset value less than their preferences. Three of the junior stocks—Pacific's Class B Common and American's Class A and B Common—are under water.

It is clear that with the exception of minor adjustments, the priority preferred exchanges are practically mathematical. American's preferred, in order to equalize its preferred position asset-wise with Pac-

| 8   1. The present companies | Pacific Southern | American Capital |
|---|---|---|
| Total net assets (before deducting funded debt) with securities at current values ................................................................ | $6,880,000* | $5,846,000 |
| Funded debt (net asset coverage 212%) ................................... | 3,000,000 | —— |
| Net Worth ........................................................ | $3,880,000 | $5,846,000 |
| Prior Preferred stock, $5.50 per share cumulative dividends, $100 preference, 24,298 shares .............................................. | (Authorized but not issued) | 2,452,000 |
| Balance for Preferred stock ........................................ | $3,880,000 | $3,394,000 |
| Net asset coverage per share of prior Preferred stock................... | | $240.60 |
| Preferred stock, preferred as to $3.00 cumulative dividend and as to assets of $50 and accrued dividends, shares.......................... | 62,915 shs | 88,000 shs |
| Net Asset Value (or coverage) per share of Preferred................. | $61.67 | $38.57 |
| Amount as to which Preferred stock has preference in liquidation.... | $3,161,000 | $6,085,000† |
| Balance applicable to Class A Common stock............................ | $719,000 | deficit |
| Net Asset Value per share of Class A Common stock................... | $4.39 | deficit |
| Common stocks: | | |
| Class A Common: | | |
| $2 cumulative dividend, $39.17† preference over Class B Common ............................................................. | 163,856 shs | —— |
| $2 non-cumulative dividend, $32 preference over Class B Common ............................................................. | —— | 110,472 shs |
| Class B Common ..................................................... | 536,865 shs | 632,662 shs |
| Minimum increase in value of total assets required to give any asset value to the Class B stock after allowing for taxes on taxable appreciation at 25% ..................................................... | 109% | 132% |

*Included in Pacific Southern's net assets are shares in American Capital Corporation (24,961 shares of Preferred, 14,200 shares of Class A and 75,000 shares of Class B) taken at a market value of $548,200.50. The net asset value of the block at April 30, 1943 was $962,745.00.

† Includes accrued and unpaid dividends of $9.17 to April 30, 1943, not preferred on liquidation.

| 2.  The merged company | Pacific-American Investors, Inc. |
|---|---|
| Total net assets (before deducting funded debt) with securities at current values | $12,071,000* |
| Funded debt (net asset coverage 402%) ............................................ | 3,000,000 |
| Net Worth ................................................................ | $ 9,071,000 |
| Prior Preferred stock (net asset coverage $373.32 per share)....................... | 2,430,000 |
| Balance for Preferred stock ................................................ | $ 6,641,000 |
| Preferred stock (preferred as to total dividends of $1.50 per share and as to assets of $25 per share) ......................................................... | 5,116,000 |
| (Net asset coverage $32.45 per share) | |
| Balance for Common ($1.14 per share on 1,337,158 shs)........................ | $ 1,525,000 |

*After deducting, from the aggregate of the assets of the two companies, inter-company holdings ($548,200.50), allowance for merger expenses ($50,000) and cash distribution on Pacific Southern Preferred ($56,623.50).

ific's preferred, receives 1¼ shares of new $25 preferred for each share of old $50 preferred and 7½ shares of new common. Thus, while its asset position is improved, its preferences based on dividend arrearages is reduced.

American's Class A and Class B common and Pacific's Class B common are, as stated, without any present asset value. Pacific's Class A common has some asset value. The present asset position of both companies' shares, as well as five hypothetical levels of value, may be found in the marginal note.[9] As counsel in support of the argument for the merger stated, there would have to be at least a 130% asset rise before the plaintiffs' "Class B common shares of American Capital would be worth nothing." It is clear that if asset values had been the sole factor in planning the merger, the preferred of both American and Pacific would have absorbed all the new common. The underwater stocks were allowed a cut apparently simply because it was recognized that these junior shares had the remote potentiality of enjoying an appreciation in market levels, and they had to be paid something for their vote in favor of the merger. Thus, it is manifest that plaintiffs' underwater stock may be financially revitalized only to the extent that present assets increase over 132%.

| 9 Pacific Southern | Values at April 30, 1943 | † Values if total assets as at Apr. 30, 1943 should | | | | |
|---|---|---|---|---|---|---|
| | | Increase by 25% | Decrease by 25% | Increase by 50% | Increase by 100% | Increase by 150% |
| Net asset coverage: | | | | | | |
| Per share present Preferred.......... | $ 61.67‡ | $ 83.08 | $ 34.33 | $103.58 | $144.59 | $185.60 |
| 2 shares new Preferred ............... | 64.90 | 91.84 | 35.42 | 113.98 | 158.20 | 202.46 |
| Net asset value: | | | | | | |
| Per share present Preferred.......... | $ 50.00 | $ 50.00 | $ 34.33 | $ 50.00 | $ 50.00 | $ 50.00 |
| Cash and securities received in exchange: | | | | | | |
| 2 shares new Preferred ............... | 50.00 | $ 50.00 | $ 35.42 | $ 50.00 | $ 50.00 | $ 50.00 |
| Cash distribution ..................... | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| 1/2 share new Common................. | 0.57 | 1.60 | def | 2.45 | 4.14 | 5.84 |
| Total securities and cash............. | $ 51.47 | $ 52.50 | $ 36.32 | $ 53.35 | $ 55.04 | $ 56.74 |
| Net asset value: | | | | | | |
| Per share present Class A Common.. | $ 4.39‡ | $ 12.61 | def | $ 20.48 | $ 36.23 | $ 39.17* |
| 3½ shares new Common............. | | 11.20 | def | 17.12 | 28.98 | 40.85 |
| Net asset value: | | | | | | |
| Per share present Class B Common. | | def | def | def | def | $ 3.91 |
| 1/5th share new Common........... | | $ 0.64 | def | $ 0.98 | $ 1.66 | $ 2.33 |
| American Capital | | | | | | |
| Net asset coverage: | | | | | | |
| Per share present Prior Preferred... | $240.60 | $300.77 | $180.47 | $348.71 | $438.96 | $529.18 |
| 1 share new Convertible Prior Preferred ............................. | 373.32 | 486.75 | 249.12 | 579.92 | 766.19 | 952.51 |
| Net asset value: | | | | | | |
| Per share present Preferred.......... | $ 38.57 | $ 55.18 | $ 21.97 | $ 68.42 | $ 69.15* | $ 69.15* |
| Securities received in exchange: | | | | | | |
| 1¼ shares new Preferred........... | $ 31.25 | $ 31.25 | $ 22.18 | $ 31.25 | $ 31.25 | $ 31.25 |
| 7½ shares new Common............. | 8.55 | 24.00 | def | 36.68 | 62.10 | 87.53 |
| Total securities ..................... | $ 39.80 | $ 55.25 | $ 22.18 | $ 67.93 | $ 93.35 | $118.78 |
| Net asset value: | | | | | | |
| Per share present Class A Common.. | def | def | def | def | $ 19.27 | $ 32.00* |
| 1 share new Common ................. | $ 1.14 | $ 3.20 | def | $ 4.89 | $ 8.28 | 11.67 |
| Net asset value: | | | | | | |
| Per share present Class B Common.. | def | def | def | def | def | $ 1.24 |
| 1/10th share new Common........... | 0.11 | $ 0.32 | def | $ 0.49 | $ 0.83 | 1.17 |

*Asset values are limited to total preferences which, at April 30, 1943, were: for Pacific Southern Class A Common $30.00 per share and accrued dividends, not preferred on liquidation (total $39.17), for American Capital Preferred $50.00 and accrued dividends (total $69.15) and for American Capital Class A Common $32.00 per share. The asset coverage at these points is in excess of these values leaving a balance of net asset value for the junior stocks. If the asset value of the Pacific Southern or American Capital Class B Common should exceed $10 per share, the Class A would participate share for share with the Class B in any such excess.

† In computing values at the various points of appreciation from the April 30, 1943 level, allowance is made for capital gains taxes at 25% upon taxable appreciation.

‡ In these figures Pacific Southern's Investment in American Capital is taken at market value; if taken at asset value the figures would be $68.26 and $6.92, respectively.

■ The plaintiffs' objections to the merger come down to this: that when indulging in asset appreciation forecast, management should not have stopped at a 150% probable increase to find equity behind the Class B common of American but they should have, on the contrary, looked to the possibility of a 200% or even 400% increase of asset appreciation. This argument is bottomed on the proposition that the Class B common, having substantially 85% of the leverage value of American's portfolio, while the remaining 15% of leverage is enjoyed by the Class A common, has the right to realize its leverage position as market prices advance. Such a period, they argue, is now upon us—prices will rise and continue to rise "indefinitely, [sic] by reason of the inflationary impetus of government deficit spending and the War." Already the Class B common has been blown up 150% on the projectural basis of asset appreciation; and a further rise of $6,327,000 or 275% increase is necessary before the Class B common would have a par value of $10 per share. The charge of unfairness cannot rest on the proposition that the management should have indulged in such fancy speculation.

It seems to me management entered the realm of the practical when they stopped their prediction of asset appreciation on the basis of a 150% rise.

■ Another attack on the fairness of the merger is directed at the handling of the intercompany holdings. Plaintiffs contend that Pacific's ownership of American stock (see footnote 7, supra) has an asset value of $962,745 and a market value of $548,200. It is argued that the treatment of this item should be on the basis that the shares are sold back to American at market value so that American may have the advantage of the $415,000 difference. I think the item has been treated so as to be fair to all parties. The gain, under the merger, is divided between the two companies— $230,000 to American and $135,000 to Pacific; the balance of $50,000 is allocated to the expense of the merger.

■ Another attack upon the fairness of the merger is directed at the proposition that the interests of the Class B Common stockholders of Pacific are promoted at the expense of the Class B Common stockholders of American. This contention ignores primary facts. Pacific Class B Common stock is substantially under water, but considerable fathoms less than the Class B Common stock of American. Since it is necessary to indulge in less fancy speculation to give the Class B Common stock of Pacific asset value, it is obvious that it should be favored over the Class B Common stock of American. But, what is more important in weighing the allocation of the Class B Common stock of Pacific is that this stock, at present, has voting control of that company. On the other hand, the Preferred stock of American has, by reason of the devolution of the sole voting power upon it through default in the payment of dividends, the absolute power at the present time to liquidate the corporation and foreclose the American Class B Common stock from any participation in the assets even without any vote on the part of the Class B stock. In view of these considerations, it is obvious that the Class B common stock of Pacific should be favored; and I find that the particular allocation is fair and equitable.

■ The final attack upon the fairness of the merger is directed at the proposition that the interests of the other classes of stockholders of American are promoted at the expense of the Class B stock. I shall deal merely with the relative rights of the Class A and Class B common stock for these are the only two classes which are at all comparable.

Here again, it is obvious that the Class A Common should be favored because it is under water to a substantially less degree, and accordingly, less market appreciation is necessary to give it value. Moreover, the Class A stock is preferred as to assets over the Class B by $3,535,000 of assets, which, it is true, do not now exist.

■ Plaintiffs make one other claim to unfairness of treatment. That is that three of the joint directors of American and Pacific will benefit financially from the merger. This is true, but the percentage benefit is small and other stockholders also benefit. As a matter of fact, this is doubtless one of the reasons for the merger. Moreover, the merger is an act of independent legal significance,[10] and the mere

---

[10] May it be said that if a jural act is lawful, i.e., if the merger is lawful, no one can claim that the motive which generated it rests on bad faith. Cf. Gans v. Delaware Terminal Corp., 23 Del.Ch. 69, 2 A.2d 154, and cases therein cited.

fact that those who initiate it will receive some benefit does not make it fraudulent.

 I think the Plan fair to all classes, especially to American's Class B common. Let a decree be submitted.