HOWARD S. GANS,

*vs.*

DELAWARE TERMINAL CORPORATION, a corporation of the State of Delaware, JOSEPH B. SCHUSSER, SR., VANCE L. BUSHNELL, B. STAFFORD MANTZ and ALEXANDER T. HUSSEY.

*New Castle, August 5, 1938.*

*Aaron Finger,* of the firm of Richards, Layton & Finger, and *George A. Spiegelberg,* of New York City, for petitioner.

*Clarence A. Southerland* and *Paul Leahy,* of the firm of Ward & Gray, for respondents.

THE CHANCELLOR: The corporate defendant has only one class of stock. It is common stock of which four thousand shares are issued and outstanding.

The annual meeting of the stockholders at which directors were to be elected was called for March 21, 1938. The meeting convened and adjourned to March 28, 1938. On the latter date a vote was taken. Two tickets were placed in nomination for the offices of five directors. Gorman was on both tickets. The persons nominated for the other four places were the real contestants. For convenience the two tickets may be called the Schusser and Anti-Schusser tickets.

The defendants Schusser, Bushnell, Mantz and Hussey were on the Schusser ticket and were declared to have been elected along with Gorman. These gentlemen met the next

day as a board and elected Schusser to the office of president, Mantz to the office of vice-president and treasurer, Gorman to the office of vice-president and assistant treasurer, and Hussey to the office of secretary.

The petition challenges the title to office of all those directors and officers except that of Gorman.

It is necessary in this opinion to consider only the question of whether the Schusser directors were elected, for the titles of the alleged officers depend upon the validity of the right of the persons who elected them to act as directors.

At the meeting the Schusser slate was declared to have received twenty-four hundred votes against sixteen hundred votes cast by the opposition.

The petitioner contends that the twenty-four hundred shares which were counted as voting for the Schusser ticket should not have been allowed to vote. The shares were voted by two proxies which were given by Continental Bank & Trust Company of New York, B. Stafford Mantz and Alexander T. Hussey, as trustees. The shares were not registered in the names of the trustees. Of their number two thousand stood in the name of Schusser as they had stood for years and four hundred were registered in the name of the executors of the Henry F. Wolff estate. The Wolff shares were purchased for one hundred thousand dollars by Schusser through an intermediary. Schusser remained in the background in the negotiations for the Wolff shares. Mantz was the ostensible purchaser. The Wolff executors turned the certificate for four hundred shares over to Mantz together with stock powers for transfer executed in blank by the executors and Mantz transferred and assigned the certificate to the trustees before named. Mantz was Schusser's agent and the stock acquired by Mantz was for and on account of Schusser whose money paid for it.

On February 28, 1938, Schusser created a trust by an instrument executed by him as trustor and the Continental Bank & Trust Company of New York, Mantz and Hussey as trustees. The corpus of the trust consisted of the two thousand and four hundred shares above mentioned, which by the instrument Schusser formally declared that he assigned and delivered to the trustees. The corpus was set forth in a schedule which described the two thousand shares evidenced by certificate No. 1 and the four hundred shares above referred to, endorsed for transfer as aforesaid, evidenced by certificate No. 12. The trustees have possession of the certificates.

The terms of the trust need not be detailed. In brief they make provision for the trustor, his wife and children. The trust is revocable by the trustor but only with the signed and acknowledged approval of two of the trustees.

The petition assigns three reasons why the trustees should not have been permitted to vote the two thousand shares which had thus been placed under the trust.

The first reason is that the trust was illegal and void under the law of the State of New York under which the trust, by its own terms, was to be executed. This reason was abandoned at the argument.

The second reason is that as the shares were never registered on the books of the company in the names of the trustees, the latter were not qualified to vote them. The solicitors for the petitioner concede that this reason is not a good one if the ruling is sound which this court made in *Gow v. Consolidated Coppermines Corp., et al.,* 19 *Del. Ch.* 172, 202, 165 *A.* 136, 148. The petitioner desires to have the right reserved to him, however, to question the correctness of that case, if it should be adhered to in this one. Seeing no reason to depart from the principle laid down in that case, I adhere to it, and accordingly hold that though the fiduciaries, the trustees, are not stockholders of record, yet,

the stock having been assigned to and held by them subject to the trust, they were entitled to vote it through their proxies.

The third and final reason urged against the reception of the voting of the stock by the trustees is that the trust is not a *bona fide* trust, but is only a scheme or device to permit Schusser to vote stock which he might not otherwise be permitted to vote.

A short recital of the facts is here necessary to understand the basis on which this reason rests. In November, 1937, this court referred the matter of an election by the stockholders of directors for the corporation to a special master. In the proceedings before the special master, the right of Schusser to vote was questioned on the ground of his mental competency, though no proceedings had ever been instituted anywhere to adjudge him *non compos mentis*. At that time the trust had not been created. The special master decided, after hearing argument, that it was proper for him to receive evidence upon the mental competency of Schusser and that he would accept or reject Schusser's vote according as the findings on the evidence would show him to be mentally competent or incompetent. The proceedings before the special master were held in abeyance and still are. In the meantime Schusser created the trust, an election was held on the date before named and the present petition was filed.

Now it is said that the sole purpose of the trust was to circumvent the inquiry before the special master into Schusser's mental condition and, if it should be found to be unsound, to prevent the consequences which the special master's opinion indicated would ensue, viz., the refusal of Schusser's right to vote.

This contention presents the principal ground on which the petitioner rests for his charge that the trust is not one which was created in good faith. I may say, in the first

place, that if Schusser was mentally competent, he was entitled to resort to any lawful means he chose to circumvent the ordeal of having his sanity inquired into as an incident to his right to vote stock which he owned. No court has ever declared him to be *non compos*. No proceedings have ever been inaugurated to have him declared to be such. He was on the stand before me and testified. Though he had suffered from a nervous breakdown prior to early in 1937, he appeared to me on the witness stand as a man of restored health, fully in possession of his faculties and quite capable of looking after his affairs. I would be going to a length far, far beyond what reason would suggest as permissible if I were now to assume that Mr. Schusser was so far in danger of being found to be too mentally incompetent, even if it were proper as the special master held to make the inquiry in a collateral proceeding, to permit the acceptance of his vote. There is not a particle of evidence before me to indicate that the charge against him had the slightest foundation in fact. The man himself, his manner and testimony, impressed me as its best refutation.

Furthermore, as bearing on the *bona fides* of the trust, the uncontradicted testimony shows that sometime in April, 1937, Schusser conceived the idea of putting his Delaware Terminal Corporation stock in a trust. At the time he was having some domestic difficulties. He took up with his attorney the matter of revising his will and at the same time discussed with him the creation of the trust. The will and the trust were apparently complementary. Then, viz., in April, 1937, the question of the control of the stockholders' meeting was, so far as appears, far from mind. Numerous conferences were held about the trust, its phraseology and drafting, with Schusser, his wife and his children. Certainly the special master's decision to take testimony upon Schusser's sanity played no part in the initiation of the idea of the trust. The special master's decision was published about February 17, 1938. There was a draft of the trust before it

was known what the special master's view would be with respect to the inquiry into Schusser's mental condition. Schusser testified that he made complaint to his lawyer about the delay since April, 1937, in getting the trust drawn up and settled. He quite frankly said on the witness stand that the question raised before the special master, though it was not then certain how it would be decided, caused him to hasten the conclusion of the trust business which had been dragging along since April of 1937. Schusser's attorney testified in general corroboration of Schusser with respect to these matters.

Schusser had a legal right to create the trust. If it be conceded, as it should not be, but nevertheless conceding, that a desire to frustrate an inquiry into his sanity by persons in hostility to him in a collateral proceeding involving the election of directors, was the originating motive for the trust, such a motive, though it would result in frustrating the inquiry, could not vitiate the legal right which he had to create the trust. The cases are rather numerous which hold that if an act be lawful, no one can claim to be damaged by it because either bad faith or even malicious purpose and intent inspired it. The motive with which a lawful act is done, is immaterial. *Nullus videtur dolo facere qui suo jure utitur*. Among the cases sustaining this principle, the following may be cited, *Eshleman v. Keenan,* 21 *Del. Ch.* 116, 181 *A.* 655; *Carroll Building Corp. v. Louis Greenberg P. Supplies, Inc.,* 216 *App. Div.* 268, 214 *N. Y. S.* 42; *Hirshfield v. Craig,* 209 *App. Div.* 555, 205 *N. Y. S.* 201; *Dalury v. Rezinas,* 183 *App. Div.* 456, 170 *N. Y. S.* 1045; *Fisher v. Fielding,* 67 *Conn.* 91, 34 *A.* 714, 32 *L. R. A.* 236, 52 *Am. St. Rep.* 270; *Roush v. Herbick,* 269 *Pa.* 145, 112 *A.* 136. The principle, though not precisely stated, nevertheless underlies the observation made by this court in *Philadelphia Storage Battery Co. v. Radio Corp. of America,* 22 *Del. Ch.* 211, 194 *A.* 414, to the effect no fraud is predicable on the lawful act of a corporation in reorganizing its business so

as to reduce its excise tax burdens, even though the purpose to curtail its tax contributions to the government was the sole motive which inspired its act.

Testimony was offered by the petitioners to show what they denominated the background in which the charge of bad faith in the matter of the trust has its setting. This testimony was rejected by me. It consisted of an offer to show that Schusser, after he was ousted from the presidency of the corporation in March, 1937, was very much chagrined, and that he endeavored by various acts to create a situation whereby his reinstatement as the president would be necessitated; and that his unvarying conduct over an extended period was designed to regain control over the corporation for himself, a design which is inconsistent, it is argued, with the functioning of a *bona fide* trust which, if it is *bona fide*, subjects his fate as the controlling influence in the corporation to the say-so of ·others, viz., the trustees. That Schusser was chagrined over his loss of the presidency of the corporation is no doubt true. That he desired to resecure his former position of influence in the conduct of its business is frankly admitted by him. And it may be conceded, if desired, that his objective of regaining his lost control was first intended to be attained through his own personal voting of the stock and that the scheme of the trust, in so far as it transferred the voting power to others, was a departure from his original intent as to the method of attaining his goal. He had the right to change his mind and alter the *modus operandi*. He was willing to trust to the judgment of his trustees. The trust was a lawful thing and if he chose to use it as the instrument to accomplish lawful ends, on what legal grounds can others, who are utter strangers in right, assume to balk him?

That considerations of this sort demonstrates that the trust was a sham, it is impossible for me to see. If the offer of the rejected testimony had been received and the court

had listened to all the details of the internal strife which led to Schusser's resignation and resulted in a determination on his part to regain his position, I am unable to see how it would reasonably tend to show that the trust he had created could be denounced as a fraudulent scheme and device to circumvent something, viz., the inquiry before the special master, which, when the so-called scheme was devised, was neither in sight nor anticipated, or if in sight, was not so inviolable in the eyes of the law that nothing, not even lawful acts, should be permitted to obviate the necessity of its further progress.

Schusser testified that he selected as trustees persons whom he could trust and that in substance he knew perfectly well that unless he could command the confidence of the trustees he would not be able to realize his ambition to resume his former position of president of the company and control its operation. The testimony is express that there is no secret understanding whatever that the trust is not to function under the trustees exactly as appears from its terms.

Much has been said about the purchase of the four hundred shares from the Wolff estate. I must confess that I am unable to appreciate the argument of the solicitors for the petitioner whereby they seek to attach something highly improper to the acquisition of that stock. The fact is that Schusser held two thousand shares, exactly one-half of the issued shares of the corporation. As between him and the other stockholders the voting power was in a deadlock. He coveted the Wolff shares so as to give him the majority of voting power. It cost him one hundred thousand dollars to secure those shares. That he kept secret his purpose to secure those shares and went about their purchase so as not to be revealed as the buyer, is quite evident. But, one asks, is that sort of thing culpable or indicative of bad faith? Clearly not. I know of no duty on him to inform his opponents in the corporation that he was going to try to secure

enough shares to give him the power necessary for his protection against their hostility. It is to be noted that even if the votes of the four hundred shares had been rejected at the meeting, the Schusser slate would have had a majority. There is an intimation that Schusser was not in fact the purchaser of those shares. That intimation, however, is thoroughly unjustified. He paid a large sum of money for them and as owner he placed them in the trust.

The petitioner cites cases in support of his position that if a trust is created to accomplish some fraudulent purpose, a court of equity will relieve against its attempted exercise in accomplishment of that purpose. I shall not review those cases. A typical one is *State ex rel. Danforth v. Hunton*, 28 *Vt.* 594, where it was held that a statute which forbade a non-resident stockholder of a bank to vote at any meeting of the corporation could not be circumvented by a non-resident's placing his stock in the hands of a local trustee who would do the voting, the stock really belonging to the non-resident.

But where is the comparable and fraudulent purpose in this case which the trust was formulated to accomplish? I can find none.

It is clear to me that a decree should be entered declaring the persons to have been elected directors who were on the Schusser ticket and that the officers chosen by the board so elected should be decreed to be the officers of the corporation.